IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BEND OIL LLC,<br><br>      Plaintiff,<br><br>v.<br><br>THE PARTNERSHIPS and UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE "A",<br><br>      Defendants. | Case No. 24-cv-02438 |

**COMPLAINT**

Plaintiff Bend Oil LLC ("Plaintiff") hereby brings the present action against the Partnerships and Unincorporated Associations Identified on Schedule A attached hereto (collectively, "Defendants") and alleges as follows:

**I. JURISDICTION AND VENUE**

1. This Court has original subject matter jurisdiction over Plaintiff's claims pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051, *et seq.*, 28 U.S.C. § 1338(a)-(b) and 28 U.S.C. § 1331.

2. Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and this Court may properly exercise personal jurisdiction over Defendants because Defendants structure their business activities to target consumers in the United States, including Illinois, through at least the fully interactive e-commerce stores operating under the aliases identified on Schedule A attached hereto (the "Seller Aliases"). Specifically, Defendants have targeted sales to Illinois residents by setting up and operating e-commerce stores that target United States consumers, offer shipping to

1

the United States, including Illinois, accept payment in U.S. dollars and, on information and belief, sell products using infringing and counterfeit versions of Plaintiff's federally registered trademark (collectively, the "Unauthorized Products") to residents of Illinois. Each of the Defendants is committing tortious acts in Illinois, is engaging in interstate commerce, and has wrongfully caused Plaintiff substantial injury in the state of Illinois.

## II. INTRODUCTION

3. Plaintiff filed this case to prevent e-commerce store operators who trade upon Plaintiff's reputation and goodwill from further selling and/or offering for sale Unauthorized Products. Defendants create e-commerce stores under one or more Seller Aliases and then advertise, offer for sale, and/or sell Unauthorized Products to unknowing consumers. E-commerce stores operating under the Seller Aliases share identifiers, such as design elements and similarities of the Unauthorized Products offered for sale, establishing that a logical relationship exists between them, and that Defendants' counterfeiting operation arises out of the same transaction, occurrence, or series of transactions or occurrences. Defendants take advantage of a set of circumstances, including the anonymity and mass reach afforded by the Internet and the cover afforded by international borders, to violate Plaintiff's intellectual property rights with impunity. Defendants attempt to avoid liability by operating under one or more Seller Aliases to conceal their identities, locations, and the full scope and interworking of their counterfeiting operation. Plaintiff is forced to file this action to combat Defendants' counterfeiting of its registered trademark, as well as to protect consumers from purchasing Unauthorized Products over the Internet. Plaintiff has been, and continues to be, irreparably damaged through consumer confusion and dilution of its valuable trademark because of Defendants' actions and therefore seeks injunctive and monetary relief.

## III. THE PARTIES

4. Plaintiff, Bend Oil LLC, is an American corporation having its principal place of business at 2850 Ocean Park Blvd., Suite 300, C/O Provident Financial, Santa Monica, California, United States 90405, and is the owner of the trademark rights asserted in this action. Plaintiff is owned by members of Blondie, the famous American rock group known for incorporating varied influences into the new wave sound of the 1970s and '80s.

5. Blondie was formed in 1974 by vocalist Debbie Harry and guitarist Chris Stein. In 1975, the pair recruited world-renowned drummer, and Rock and Roll Hall of Fame member, Clem Burke. Blondie emerged as the great pop icon of New York's celebrated late '70s new wave punk scene by defying easy categorization. They wrote great rock hooks and brilliant, ironic lyrics. Blondie brought the worlds of rock, punk, disco and ska together to create one of the most trailblazing and influential bands of all-time. Blondie's famous singles include hits like "Call Me", "Heart of Glass", and "Maria".[1] Debbie Harry, Chris Stein, Clem Burke, and their bandmates in Blondie are undeniable pop icons and their sound and sensibility remains as fresh as when they first topped the charts in the late 1970s.

6. Some of Blondie's noteworthy achievements include their 2006 induction into the Rock and Roll Hall of Fame and their 2014 NME Award for NME Godlike Genius - a UK Music Award to honor a figure or group who has helped to shape the musical landscape over the years. On top of that, Blondie has been nominated for multiple Grammys and Junos, and has won countless awards: (1) a Juno Award for Best Selling Single for "Heart of Glass" in 1980, (2) Q Award for Outstanding Contribution to Music in 2016 and (3) BBC Longshots Audience Award

---

[1] Blondie has had 6 singles reach the top spot on the U.K. charts (*see* https://www.officialcharts.com/artist/16742/blondie/) and 4 reach the top of the U.S. Billboard Hot 100 (*see* https://www.billboard.com/artist/blondie/).

in 2022—the BBC's signature festival dedicated to emerging documentary filmmakers - for *Blondie; Vivi ren la Habana* (a documentary about Blondie travelling to Cuba and playing in Havana with local musicians). Furthermore, Blondie has been nominated for a Grammy Award for Best Historical Album for *Against the Odds: 1974-1982* for the upcoming Grammy Awards in 2023 and is nominated for the Songwriters Hall of Fame in 2023 - an institution to honor those whose work represents and maintains the heritage and legacy of the most beloved English language songs from the world's popular music songbook.

7. Blondie's active presence in their fans' lives, including 40 million albums sold and countless accolades later, is something to be treasured. Blondie's impact has been greater than the sum of its record sales: Debbie Harry's persona, and the band's boundary-pushing pop, has shaped the look and sound of many chart-topping female artists who followed in the last three decades, from Madonna to Lady Gaga to Katy Perry and Sia.

8. With a strong fan-base, Plaintiff markets and sells a variety of Blondie-branded products, including clothing, posters, watches, and other merchandise bearing Plaintiff's BLONDIE trademark (collectively, "Plaintiff's Products"). Plaintiff's Products have become enormously popular and even iconic, driven by Plaintiff's quality standards and innovative designs. Among the purchasing public, Plaintiff's Products are instantly recognizable as such. Plaintiff's Products are distributed and sold to consumers through Plaintiff's website, shop.blondie.net.

9. Plaintiff has used the BLONDIE trademark for many years and has continuously sold products under the BLONDIE trademark ("Plaintiff's Trademark"). As a result of this long-standing use, strong common law trademark rights have amassed in Plaintiff's Trademark. Plaintiff's use of the mark has also built substantial goodwill in Plaintiff's Trademark. Plaintiff's

Trademark is a famous mark and a valuable asset of Plaintiff. Many of Plaintiff's Products include Plaintiff's Trademark.

10. Plaintiff's Trademark is registered with the United States Patent and Trademark Office, which is included below.

| Registration Number | Trademark | Registration Date | Goods and Services |
|---|---|---|---|
| 5,710,345 | BLONDIE | March 26, 2019 | For: Musical sound recordings; phonograph records featuring music; audio and video recordings featuring music and artistic performances; digital media, namely, pre-recorded video cassettes, digital video discs, digital versatile discs, downloadable audio and video recordings, CDs, DVDs, high definition digital discs featuring music, musical entertainment and artistic performances in class 009.<br><br>For: Watches in class 014.<br><br>For: Posters, stickers in class 016.<br><br>For: Clothing, namely, t-shirts, jerseys, hoodies, shirts in class 025.<br><br>For: Online retail store services featuring musical sound recordings, phonograph records featuring music, audio and video recordings featuring music, musical entertainment and artistic performances, digital media, namely, downloadable audio, CDs, high definition digital discs featuring music, musical entertainment and artistic performances, |

|  |  |  | watches, posters, stickers and clothing in class 035. |
|---|---|---|---|

11. The above U.S. registration for Plaintiff's Trademark is valid, subsisting, and in full force and effect. The registration for Plaintiff's Trademark constitutes *prima facie* evidence of its validity and of Plaintiff's exclusive right to use Plaintiff's Trademark pursuant to 15 U.S.C. § 1057(b). A true and correct copy of the United States Registration Certificate for Plaintiff's Trademark is attached hereto as **Exhibit 1**.

12. Plaintiff's Trademark is exclusive to Plaintiff and is displayed extensively on Plaintiff's Products and in marketing and promotional materials. Plaintiff's Trademark is also distinctive when applied to Plaintiff's Products, signifying to the purchaser that the products come from Plaintiff or its licensees and are manufactured to Plaintiff's quality standards. Whether Plaintiff manufactures the products itself or contracts with others to do so, Plaintiff has ensured that products bearing Plaintiff's Trademark are manufactured to the highest quality standards.

13. Plaintiff's Trademark is a famous mark, as that term is used in 15 U.S.C. § 1125(c)(1) and has been continuously used and never abandoned. The success of Blondie, in addition to the marketing of Plaintiff's Products, has enabled the Blondie brand to achieve widespread recognition and fame and has made Plaintiff's Trademark one of the most well-known marks in the music industry. The widespread fame, outstanding reputation, and significant goodwill associated with the Blondie brand have made Plaintiff's Trademark a valuable asset of Plaintiff.

14. Products bearing Plaintiff's Trademark have been the subject of substantial and continuous marketing and promotion. Plaintiff has marketed and promoted, and continues to

market and promote, Plaintiff's Trademark in the industry and to consumers through its website shop.blondie.net.

15. Plaintiff has expended substantial time, money, and other resources advertising, promoting, and marketing Plaintiff's Products. Plaintiff's Products have also been the subject of extensive unsolicited publicity due to the longstanding success of the Blondie brand. As a result, products bearing Plaintiff's Trademark are widely recognized and exclusively associated by consumers as being high-quality products sourced from Plaintiff. Plaintiff's Trademark has achieved tremendous fame and recognition, adding to the inherent distinctiveness of the mark. As such, the goodwill associated with Plaintiff's Trademark is of immeasurable value to Plaintiff.

16. Plaintiff's Products are sold only by Plaintiff or through authorized retail channels and are recognized by the public as being exclusively associated with the Blondie brand.

17. Defendants are unknown individuals and business entities who own and/or operate one or more of the e-commerce stores under the Seller Aliases identified on Schedule A and/or other seller aliases not yet known to Plaintiff. On information and belief, Defendants reside and/or operate in foreign jurisdictions and redistribute products from the same or similar sources in those locations. Defendants have the capacity to be sued pursuant to Federal Rules of Civil Procedure 17(b).

18. On information and belief, Defendants, either individually or jointly, operate one or more e-commerce stores under the Seller Aliases listed in Schedule A attached hereto. Tactics used by Defendants to conceal their identities and the full scope of their operation make it virtually impossible for Plaintiff to learn Defendants' true identities and the exact interworking of their counterfeit network. If Defendants provide additional credible information regarding their identities, Plaintiff will take appropriate steps to amend the Complaint.

## IV. DEFENDANTS' UNLAWFUL CONDUCT

19. The success of the Blondie brand has resulted in significant counterfeiting of Plaintiff's Trademark. Because of this, Plaintiff has implemented an anti-counterfeiting program that involves investigating suspicious websites and online marketplace listings identified in proactive Internet sweeps. Recently, Plaintiff has identified many fully interactive e-commerce stores offering Unauthorized Products on online marketplace platforms such as AliExpress, Inc. ("AliExpress"), Amazon.com, Inc. ("Amazon"), eBay, Inc. ("eBay"), Etsy, Inc. ("Etsy"), Pixels.com, LLC d/b/a Pixels ("Pixels"), Redbubble Limited ("Redbubble"), Spreadshirt, Inc. ("Spreadshirt"), and ContextLogic, Inc. d/b/a Wish.com ("Wish"), including the e-commerce stores operating under the Seller Aliases. The Seller Aliases target consumers in this Judicial District and throughout the United States. According to a report prepared for The Buy Safe America Coalition, most counterfeit products now come through international mail and express courier services (as opposed to containers) due to increased sales from offshore online counterfeiters. *The Counterfeit Silk Road: Impact of Counterfeit Consumer Products Smuggled Into the United States*, prepared by John Dunham & Associates (**Exhibit 2**).

20. Because counterfeit products sold by offshore online counterfeiters do not enter normal retail distribution channels, the U.S. economy lost an estimated 300,000 or more full-time jobs in the wholesale and retail sectors alone in 2020. *Id*. When accounting for lost jobs from suppliers that would serve these retail and wholesale establishments, and the lost jobs that would have been induced by employees re-spending their wages in the economy, the total economic impact resulting from the sale of counterfeit products was estimated to cost the United States economy over 650,000 full-time jobs that would have paid over $33.6 billion in wages and benefits. *Id.* Additionally, it is estimated that the importation of counterfeit goods costs the United

States government nearly $7.2 billion in personal and business tax revenues in the same period. *Id.*

21. Online marketplace platforms like those used by Defendants do not adequately subject new sellers to verification and confirmation of their identities, allowing counterfeiters to "routinely use false or inaccurate names and addresses when registering with these e-commerce platforms." **Exhibit 3**, Daniel C.K. Chow, *Alibaba, Amazon, and Counterfeiting in the Age of the Internet*, 40 NW. J. INT'L L. & BUS. 157, 186 (2020); *see also* report on "Combating Trafficking in Counterfeit and Pirated Goods" prepared by the U.S. Department of Homeland Security's Office of Strategy, Policy, and Plans (Jan. 24, 2020), attached as **Exhibit 4**, and finding that on "at least some e-commerce platforms, little identifying information is necessary for a counterfeiter to begin selling" and that "[t]he ability to rapidly proliferate third-party online marketplaces greatly complicates enforcement efforts, especially for intellectual property rights holders". Counterfeiters hedge against the risk of being caught and having their websites taken down from an e-commerce platform by establishing multiple virtual storefronts. **Exhibit 4** at p. 22. Since platforms generally do not require a seller on a third-party marketplace to identify the underlying business entity, counterfeiters can have many different profiles that can appear unrelated even though they are commonly owned and operated. **Exhibit 4** at p. 39. Further, "[e]-commerce platforms create bureaucratic or technical hurdles in helping brand owners to locate or identify sources of counterfeits and counterfeiters." **Exhibit 3** at 186-187. Specifically, brand owners are forced to "suffer through a long and convoluted notice and takedown procedure only [for the counterfeit seller] to reappear under a new false name and address in short order". *Id.* at p. 161.

22. Defendants have targeted sales to Illinois residents by setting up and operating e-commerce stores that target United States consumers using one or more Seller Aliases, offer

shipping to the United States, including Illinois, accept payment in U.S. dollars and, on information and belief, sell Unauthorized Products to residents of Illinois.

23. Defendants concurrently employ and benefit from similar advertising and marketing strategies. For example, Defendants facilitate sales by designing the e-commerce stores operating under the Seller Aliases so that they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers. E-commerce stores operating under the Seller Aliases appear sophisticated and accept payment in U.S. dollars in multiple ways, including via credit cards, Alipay, Amazon Pay, and/or PayPal. E-commerce stores operating under the Seller Aliases often include content and images that make it very difficult for consumers to distinguish their stores from an authorized retailer. Plaintiff has not licensed or authorized Defendants to use Plaintiff's Trademark, and none of the Defendants are authorized retailers of Plaintiff's Products.

24. Many Defendants also deceive unknowing consumers by using Plaintiff's Trademark within the content, text, and/or meta tags of their e-commerce stores to attract consumers using search engines to find websites relevant to Plaintiff's Products. Other e-commerce stores operating under the Seller Aliases omit using Plaintiff's Trademark in the item title to evade enforcement efforts while using strategic item titles and descriptions that will trigger their listings when consumers are searching for Plaintiff's Products.

25. E-commerce store operators like Defendants commonly engage in fraudulent conduct when registering the Seller Aliases by providing false, misleading and/or incomplete information to e-commerce platforms to prevent discovery of their true identities and the scope of their e-commerce operation.

26. E-commerce store operators like Defendants regularly register or acquire new seller aliases for the purpose of offering for sale and selling Unauthorized Products. Such seller alias

registration patterns are one of many common tactics used by e-commerce store operators like Defendants to conceal their identities and the full scope and interworking of their counterfeiting operation, and to avoid being shut down.

27.     Even though Defendants operate under multiple fictitious aliases, the e-commerce stores operating under the Seller Aliases often share unique identifiers, such as templates with common design elements that intentionally omit contact information or other information for identifying Defendants or other Seller Aliases they operate or use.  E-commerce stores operating under the Seller Aliases include other common features, such as registration patterns, accepted payment methods, check-out methods, keywords, advertising tactics, similarities in price and quantities, the same incorrect grammar and misspellings, and/or the use of the same text and images. Additionally, Unauthorized Products for sale by the Seller Aliases bear similar irregularities and indicia of being counterfeit to one another, suggesting that the Unauthorized Products were manufactured by and come from a common source and that Defendants are interrelated.

28.     E-commerce store operators like Defendants communicate with each other through QQ.com chat rooms and utilize websites, like sellerdefense.cn, that provide tactics for operating multiple online marketplace accounts and evading detection by brand owners. Websites like sellerdefense.cn also tip off e-commerce store operators, like Defendants, of new intellectual property infringement lawsuits filed by brand owners, such as Plaintiff, and recommend that e-commerce operators cease their infringing activity, liquidate their associated financial accounts, and change the payment processors that they currently use to accept payments in their online stores.

29.     Counterfeiters such as Defendants typically operate under multiple seller aliases and payment accounts so that they can continue operation despite Plaintiff's enforcement. E-

commerce store operators like Defendants maintain off-shore bank accounts and regularly move funds from their financial accounts to offshore accounts outside the jurisdiction of this Court to avoid payment of any monetary judgment awarded to Plaintiff.

30. Defendants are working in active concert to knowingly and willfully manufacture, import, distribute, offer for sale, and sell Unauthorized Products in the same transaction, occurrence, or series of transactions or occurrences. Defendants, without any authorization or license from Plaintiff have, jointly and severally, knowingly and willfully used and continue to use Plaintiff's Trademark in connection with the advertisement, distribution, offering for sale, and sale of Unauthorized Products into the United States and Illinois over the Internet.

31. Defendants' unauthorized use of Plaintiff's Trademark in connection with the advertising, distribution, offering for sale, and sale of Unauthorized Products, including the sale of Unauthorized Products into the United States, including Illinois, is likely to cause, and has caused, confusion, mistake, and deception by and among consumers and is irreparably harming Plaintiff.

## COUNT I
## TRADEMARK INFRINGEMENT AND COUNTERFEITING (15 U.S.C. § 1114)

32. Plaintiff hereby re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs.

33. This is a trademark infringement action against Defendants based on their unauthorized use in commerce of counterfeit imitations of Plaintiff's Trademark in connection with the sale, offering for sale, distribution, and/or advertising of infringing goods. Plaintiff's Trademark is a highly distinctive mark. Consumers have come to expect the highest quality from Plaintiff's Products offered, sold, or marketed under Plaintiff's Trademark.

34. Defendants have sold, offered to sell, marketed, distributed, and advertised, and are still selling, offering to sell, marketing, distributing, and advertising products using counterfeit reproductions of Plaintiff's Trademark without Plaintiff's permission.

35. Plaintiff is the owner of Plaintiff's Trademark. Plaintiff's United States registration for Plaintiff's Trademark is in full force and effect. On information and belief, Defendants have knowledge of Plaintiff's rights in Plaintiff's Trademark and are willfully infringing and intentionally using infringing and counterfeit versions of Plaintiff's Trademark. Defendants' willful, intentional, and unauthorized use of Plaintiff's Trademark is likely to cause, and is causing, confusion, mistake, and deception as to the origin and quality of the Unauthorized Products among the general public.

36. Defendants' activities constitute willful trademark infringement and counterfeiting under Section 32 of the Lanham Act, 15 U.S.C. § 1114.

37. Plaintiff has no adequate remedy at law, and if Defendants' actions are not enjoined, Plaintiff will continue to suffer irreparable harm to its reputation and the goodwill of Plaintiff's Trademark.

38. The injuries and damages sustained by Plaintiff have been directly and proximately caused by Defendants' wrongful reproduction, use of advertisement, promotion, offering to sell, and/or sale of Unauthorized Products.

## COUNT II
## FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a))

39. Plaintiff hereby re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs.

40. Defendants' promotion, marketing, offering for sale, and sale of Unauthorized Products has created and is creating a likelihood of confusion, mistake, and deception among the

general public as to the affiliation, connection, or association with Plaintiff or the origin, sponsorship, or approval of Defendants' Unauthorized Products by Plaintiff.

41. By using Plaintiff's Trademark in connection with the offering for sale and/or sale of Unauthorized Products, Defendants create a false designation of origin and a misleading representation of fact as to the origin and sponsorship of the Unauthorized Products.

42. Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the Unauthorized Products to the general public involves the use of counterfeit marks and is a willful violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

43. Plaintiff has no adequate remedy at law and will continue to suffer irreparable harm to its reputation and the associated goodwill of the Blondie brand if Defendants' actions are not enjoined.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1) That Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under, or in active concert with them be temporarily, preliminarily, and permanently enjoined and restrained from:

   a. using Plaintiff's Trademark or any reproduction, counterfeit copies or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not one of Plaintiff's Products or is not authorized by Plaintiff to be sold in connection with Plaintiff's Trademark;

   b. passing off, inducing, or enabling others to sell or pass off any product as one of Plaintiff's Products or any other product produced by Plaintiff, that is not Plaintiff's

    or not produced under the authorization, control, or supervision of Plaintiff and approved by Plaintiff for sale under Plaintiff's Trademark;

  c. committing any acts calculated to cause consumers to believe that Defendants' Unauthorized Products are those sold under the authorization, control, or supervision of Plaintiff, or are sponsored by, approved by, or otherwise connected with Plaintiff;

  d. further infringing Plaintiff's Trademark and damaging Plaintiff's goodwill; and

  e. manufacturing, shipping, delivering, holding for sale, transferring, or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Plaintiff, nor authorized by Plaintiff to be sold or offered for sale, and which bear any of Plaintiff's Trademark;

2) Entry of an Order that, upon Plaintiff's request, those with notice of the injunction, including without limitation, any websites and/or online marketplace platforms, such as AliExpress, Amazon, eBay, Etsy, Pixels, Redbubble, Spreadshirt, and Wish, shall disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of counterfeit and infringing goods using Plaintiff's Trademark;

3) That Defendants account for and pay to Plaintiff all profits realized by Defendants by reason of Defendants' unlawful acts herein alleged, and that the amount of damages for infringement of Plaintiff's Trademark be increased by a sum not exceeding three times the amount thereof as provided by 15 U.S.C. § 1117;

4) In the alternative, that Plaintiff be awarded statutory damages for willful trademark counterfeiting pursuant to 15 U.S.C. § 1117(c)(2) of $2,000,000 for each and every use of Plaintiff's Trademark;

5) Plaintiff is further entitled to recover its attorney's fees and full costs; and

6) Award any and all other relief that this Court deems just and proper.

Dated this 26th day of March 2024.                    Respectfully submitted,

/s/ Martin F. Trainor<br>
Martin F. Trainor<br>
Sydney Fenton<br>
Richard Poskozim<br>
Alexander Whang<br>
TME Law, P.C.<br>
10 S. Riverside Plaza<br>
Suite 875<br>
Chicago, Illinois 60606<br>
708.475.1127<br>
martin@tme-law.com<br>
sydney@tme-law.com<br>
richard@tme-law.com<br>
alexander@tme-law.com<br>
<br>
*Counsel for Plaintiff Bend Oil LLC*